Trailer Transit, Inc. May it please the Court, the Court shall reverse because the District Court misconstrued the contractual compensation provision at issue in this case, and when properly construed, issues of fact preclude summary judgment. The compensation provision at issue provided simply for a split of gross revenues between Trailer Transit and the drivers on loads that the drivers hauled to Trailer Transit's customers. This split would- Counsel, let me tell you what my problem is with this position. It's fundamentally the same as the District Court's. The contract says 71% of gross for the main charge, and what you're now arguing is what that really means is 71% of gross on some portion of the charge and 71% of net on the remaining portion of the charge. And there's just no language in the contract about 71% of net about anything. So I could imagine you arguing that everything that is not just a charge for a particular item has to go into the 71% of gross. Is that your position? Our position is that the label that Trailer Transit places on an item does not determine whether that item is actually intended to reimburse or not. There's an underlying fact to be decided, not just a label that can be placed. I don't think you listened to my question. You might be arguing, I'm trying to figure out whether you're making this argument, which is if an item is billed out by Trailer Transit at significantly more than the cost of providing that item, then it has to go into the 71% of gross box, and you get 71% of their gross revenues without regard to their costs. Is that the argument you're making now? We have made alternative arguments on that. The first one- The answer is either yes or no. Please tell me whether it is yes or no. Yes, if the court determines that it's an item in, item out determination, then our position is that an item where there was a gross inflation or no underlying expense would be an item to be included completely in a 71% split with the driver. And that gets to the point that the- what has happened here is that we have fundamentally a shift in compensation and gross revenues from the drivers to Trailer Transit simply by taking part of the gross revenue and putting a label on it that has no underlying tie to what in fact happened for the particular load. Did you make this line of argument in the district court? That is, did you say to the district court, we are not seeking 71% of net on any item. What we want is to have certain items transferred into the column from which we get 71% of gross. We made both arguments to the district court, both the portion of and the 71% of the entire fee. We made them in the alternative to one another. The district court certainly didn't perceive you making that argument and I, reading your brief, didn't perceive you making that argument. In our summary judgment, what Trailer Transit specifically said was, this has to be an item in, item out thing. So it's either an item is in or it's out, you can't use this net portion. And what we responded was specifically, no, a reasonable jury could find that where an entire item would be then included and 71% would go to the drivers. We made that specifically in response to their argument that we hadn't made that argument. What we have also is an argument by Trailer Transit that somehow they were permitted to deduct their overhead costs, but the compensation provision does not contemplate that. What the compensation provision provides is that Trailer Transit may deduct items intended to reimburse it for special services, such as third party costs like permits, escort services, and other special administrative costs. This provision was not intended to allow Trailer Transit to shift its overhead costs to the driver or to sponsor those costs like it can for the third party. Are you arguing that how Trailer Transit allocates these items has changed over the years? No. Some of the labels I'm trying to say. That's potentially significant. I mean, suppose that it's well known that Trailer Transit allocates its charges in a particular way and your client then signs a contract agreeing to 71% of the gross on a particular one of these items. That makes it very hard, does it not, to say what we really want is 71% of the gross on everything. No, I don't think that there's anything in the record about the driver's understanding of any practice by Trailer Transit. I didn't ask about anybody's understanding. I asked about timing. If these contracts are signed at a time when Trailer Transit is already doing what you How does one understand that contract as putting everything into the 71% of gross volume? You could be arguing that, say, we signed the contract in 2000 and then in 2005 Trailer Transit made this change and they're behaving opportunistically in light of the terms of the contract. Are you making that line of argument, that there was an opportunistic change? No, we're not making an opportunistic change argument. These overcharges are charges that are, for the most part, unknown to the drivers because they, for the most part, do not see the underlying costs. There was a happenstance that, for our particular named plaintiff, he became aware of a load where Trailer Transit had deducted from his compensation, charged over $200 for an escort service, and he was aware that there was no escort service because he had been driving that load. So it was just a matter of happenstance that this would even come to a driver's attention. So if Trailer Transit, I'm just curious, obtained gross revenue as a result of fraud, is it your position that Walker is entitled to his share of fraudulent revenue? However, Trailer Transit obtained the revenue does not matter on the back end to the drivers. This is a case about the agreement made between the drivers and Trailer Transit. Trailer Transit may have been overpaid by a customer, it may have been underpaid. That doesn't matter to the contract between the drivers and what the driver was owed for his work in procuring that. I don't really understand that. So why would the driver care about anything except the bottom line, how much he's getting back? And if it's not enough, he'll go work for someone else. Well, what the driver... You don't usually... I mean, would it be, would you be arguing that the driver could, you know, audit all of Trailer Transit's expenditures to see whether they were prudent? Is that what you're arguing? No, and there is a high turnover in this industry, but the drivers, what the drivers had was an agreement up front that they would be paid on a certain scale, and they were paid at a lower scale. It doesn't matter that they stuck around, not knowing that they were being paid at a lower scale, but accepting it. They had an agreement where they were entitled to the higher payment that Trailer Transit was siphoning away by labeling items incorrectly. I don't understand your siphoning away. They say, you know, there are charges for this, that, and the other thing, and you're arguing that they, that these charges are excessive. Well, a lot of times one buys something and the charge is excessive, right? Right. But what the charge that was allowed to be deducted was the charge for, that was intended to reimburse Trailer Transit. What Trailer Transit was doing was charging that, or deducting that when there was no underlying expense even, or when the underlying expense made it. Yes, but this is where you're getting into the internal finances of a company, which is always happy to, you know, charge more than something costs, right? No, I don't believe we are, because the provision doesn't contemplate that they can deduct overhead or things like this. These are out-of-pocket costs that they have to do in order for the truck to get from A to B. They have to pay for a permit in order for the truck to drive. They have that cost. They have to pay for the escort. They have that cost. What they're doing is, even though they have those costs, they are inflating them, keeping all of that inflation as their gross revenue, and then splitting the smaller part with the just a complete shift of revenue without the driver having any control over it. What about the hourly wage of the employee who took an hour to arrange escort services? Would that fall under it, or would that solely be Trailer Transit's revenue? That's an overhead cost to Trailer Transit of its normal business operations. It's not a special cost. It's not a special service. It's part of their normal operation. I'll return to you later. OK. Thank you, Mr. Miller. Mr. Eckhart? Good morning. May it please the Court, my name is Christopher Eckhart, and I represent the Defendant Employee Trailer Transit Incorporated. Judge Williams, if I could just start with a question you just asked about the wages of the permit department, which is really at the heart of this case, the internal cost to Trailer Transit of providing these special services. One of the arguments I just heard was that the term special in the compensation provision, special services, evidences the party's intent that Trailer Transit was limited to charging its out-of-pocket costs, which is preliminary. The plaintiff never made an argument based upon that phrase to the district court and didn't make it to this court until a reply brief, so I think that argument, that interpretation of the contract has been waived. But the evidence in the actual record on whether this is a special outside the norm of Trailer Transit is that, in terms of normal business operations, plaintiff's expert analyzed 94 loads that the plaintiff did in 2010. Of those 94 loads, only 9 had permit charges. That's less than 10%. This isn't a mainstream, normal business operation type of load for Trailer Transit. It is outside the norm, and part of the service Trailer Transit provides to the shipper customer is determining, based upon the size of the load and the specifications of the load provided by the customer, and the route that that trailer has to take to get to the shipper's customer and state laws, what permits are required. This is specialized knowledge, extra work Trailer Transit has to do on those special loads requiring permits that it then charges the customer for providing those services. Trailer Transit intends to be reimbursed by a permit charge, not only for the out-of-pocket cost of the permit, but the internal cost of providing that special service to the customer. There was a question, Judge Eastbrook, you asked about the history of the parties and whether this practice, according to the plaintiffs, had been established before or after the contract had changed. One example that is in the record, the example that the plaintiff cites is a 2009 escort service that he claimed was charged to the shipper, but there was no escort service. That load in June of 2009 predates the contract that is in the supplemental appendix, or excuse me, in the appendix at pages 29 to 35. And so at that time the plaintiff had already had an example of what he claims is a charge that he should have shared in the revenue, yet the unambiguous terms of the contract that he signed after that load state, the driver is not entitled to items intended to an escort service. That unequivocal language is in the contract. And so we would draw on the court's recent opinion and we submitted a Rule 28J letter on the Lawson case. And that case goes through the rules of contract interpretation under Indian law. Unambiguous terms of a contract are conclusive on the parties and the courts. The contract terms are not read in isolation and the contract terms are read holistically and harmoniously. And so our interpretation of the contract is consistent with both item in, item out. The entire item is in or out, not plaintiff's original portion of the theory that was pled and certified and that the district court addressed, but also it's consistent with the services and the concept of reimburse. And so the other thing that's raised by the plaintiff's argument, which Judge Easterbrook you raised, was they just said that if a, that for a permit charge, they could potentially be entitled to 71% of all the revenue from that charge, even the out of pocket cost for that permit. And no reasonable juror could look at the compensation provision and say, plaintiff, you're entitled to 71% of a permit charge. Even if the permit costs $35, the plaintiff, you're not entitled to 71% of $35. And so ours is a straightforward, easily workable interpretation of the contract. One of the key issues the court said in Lawson, there were vexing questions caused by the court's, the plaintiff's interpretation of that contract in that case. And that meant, and the court looked at that and said, that means it's an unreasonable interpretation. We will, on the other hand, favor an interpretation of the contract that doesn't cause vexing questions. The plaintiff's theory here causes vexing questions about on each load, each charge, whether the charge will be in or out of the gross revenue. In our opinion, the contract, the unambiguous terms of the contract dictate that they are not entitled to permit charges or escrow charges and any revenue from that. If I could briefly touch on our argument about waiver, in the reply brief in footnote 7, they now say, they don't challenge or they don't claim that the manner in which Trailer Transit charges its customers results in overcharges to the customers or is in any way inconsistent with the contracts Trailer Transit has with its customers. So we bill based upon what's quoted to the customer on the front end, based upon the information provided by the customer, and we bill that once it's agreed to by the customer. They are somehow saying that in the back end, when Trailer Transit determines the driver's compensation, we are manipulating the revenue somehow by labeling it. But the decisions made on the front end with the customer, we line item invoice our customer, so the customer sees a permit charge for $600 on the invoice and pays it. That's the contract with the customer. And so plaintiff doesn't dispute that the way we charge our customers is consistent with those customer contracts. It is just, the plaintiff is just now saying, in some circumstances, I get some of that consistent with the customer contracts, because a jury could determine that it wasn't intended to reimburse, but the contract answers the question. You don't get permit charges, you don't get escort charges, and it's essentially as simple as that. If there are no further questions, I think I'll rest on the briefs. Okay, thank you very much, Mr. Eckhardt. Mr. Miller, do you have anything further? What the contract says is that Trailer Transit gets items intended to reimburse it, and what Trailer Transit has done has withdrawn items where it had no underlying cost whatsoever in order to shift the compensation it got from the customer from the driver. As far as internal costs, the items listed after special services and costs are permits, escorts, there was testimony from the CFO that permits are something they call up a permit agency and they have a cost because the permit agency performs the task of figuring out what the permits are. The escort fees are the same way. They don't drive the car down the road in front of the semi, they call a company, they have a fixed cost. Those special services are intended to be out-of-pocket costs, not internal costs, which the driver would have no control over whatsoever, and Trailer Transit would have all the discretion in the world to shift revenue completely to itself. Thank you. Okay, thank you very much to both counsel.